**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

DARLENE PHERSON,

                Plaintiff,

vs.                                        CASE NO: 2:06-cv-59-JES-29SPC

JOANNE BARNHART,
Commissioner of Social Security,

                Defendant.

_____

**REPORT AND RECOMMENDATION[1]**

_____This matter comes before the Court on the Plaintiff Darlene Pherson's Complaint Seeking Review of the Final Decision of the Commissioner of Social Security (Commissioner) denying the Plaintiff's Claim for Disability Insurance (Doc. # 1) filed on January 27, 2006.  The Plaintiff filed her Memorandum of Law in Support of the Complaint (Doc. #14) on August 22, 2006.    The Commissioner filed her Memorandum of Law in Support of the Commissioner's Decision (Doc. #16) on September 20, 2006. Thus, the Motion is now ripe for review.

The Undersigned has reviewed the record, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and administrative record, and the pleadings and memoranda submitted by the parties in this case.

---

[1]This Report and Recommendation addresses only the issues brought up for review by the District Court pursuant to 28 U.S.C. § 405(g).

1

## FACTS

### *Procedural History*

The Plaintiff filed an application for Disability Insurance Benefits (DIB) on December 4, 1998, alleging disability beginning September 30, 1995. (Tr. 20). The Plaintiff's application was denied initially, upon reconsideration and by another United States Administrative Law Judge on January 28, 2000. (Tr. 20). The Plaintiff's request for review by the Appeals Council was denied. (Tr. 20). The Plaintiff failed to pursue further appeal of the application, therefore, the January 28, 2000, decision became res judicata. (Tr. 20).

The Plaintiff filed the current application for Disability Insurance Benefits on June 8, 2001, alleging an onset disability date of January 29, 2000. (Tr. 20, 49-50). The Plaintiff's application was denied initially and upon reconsideration. (Tr. 20, 36-45). The Plaintiff filed a request for hearing on July 5, 2002. (Tr. 47-48). On April 1, 2004, a hearing was held before the Honorable Elving L. Torres, Administrative Law Judge (ALJ), in Fort Myers, Florida. (Tr. 20). The ALJ issued an unfavorable decision on May 27, 2004. (Tr. 20-31). The Plaintiff filed a Request for Review of Hearing Decision. (Tr. 9). The Appeals Council declined to review the decision making the ALJ's decision the final decision of the Commissioner. (Tr. 6-8). Pursuant to 42 U.S.C. § 405(g), the Plaintiff now seeks judicial review of the Commissioner's final decision.

### *Plaintiff's History*

The Plaintiff was born on June 4, 1947, making her fifty-six (56) years of age at the time of the hearing. (Tr. 21, 49). The Plaintiff has a twelfth (12th) grade education, plus one (1) year college education. (Tr. 21). The Plaintiff has a past relevant work history as an accounts manager, a sales representative, a manufacturing representative, a sales person and a delivery truck driver. (Tr. 21).

2

The Plaintiff alleges disability due to low back pain and asthma.  (Tr. 21).

*Medical and Psychological History*

The medical evidence reveals that on April 11, 2001,  the Plaintiff presented to Dr. Saiful Islam, a physician with the Lee Memorial Health System, Lee Convenient Care. (Tr. 162).  The Plaintiff's chief complaint was of lower back pain as a result of lifting a heavy box full of catalogs. (Tr. 162).  Dr. Islam noted localized tenderness at the bilateral sacroiliac region that was tender to the touch and painful.  (Tr. 162).  An MRI was performed on the Plaintiff and revealed no fracture or mal-alignment, with mild disc space narrowing at the lower lumbar region. (Tr. 163).   The Plaintiff was given Medrol Dosepak, Celebrex 200 mg,  and Darvocet N100 and was directed to rest and return for a follow up in five (5) days. (Tr. 162.).  The Plaintiff returned on April 16, 2001, as instructed and complained of back pain especially when she is in the car and pain that sometimes goes into her right leg.  (Tr. 154).  Upon examination, Dr. Islam noted pain in the bilateral sacroiliac region.  (Tr. 154).  Dr. Islam referred the Plaintiff to physical therapy three times a week for two weeks. (Tr. 154).  Dr. Islam advised the Plaintiff to do sedentary duties and refrain from driving.  (Tr. 154).  Upon discharge, the Plaintiff mentioned urinary incontinence and a history of back problems about six years ago.  (Tr. 154).  Dr. Islam ordered an MRI of the LS spine to rule out lumbar disk pathology.  (Tr. 154).

On April 17, 2001, the Plaintiff returned to the Lee Memorial Health System and was seen by Dr. Paul Fortier. (Tr. 150). The Plaintiff advised that she was not getting adequate pain control from the Darvocet. (Tr. 150).  Upon examination, Dr. Fortier noted a little bit of tenderness.  (Tr. 150).  The Plaintiff's reflexes were normal in the lower extremities with normal sensation.  (Tr. 150). The Plaintiff requested Toradol and prescription strength Ibuprofen.  (Tr. 150).  She advised Dr.

Fortier that she was claustrophobic and would like Xanax to relax her prior to undergoing her MRI. (Tr. 150). Dr. Fortier prescribed Toradol, Xanax, Motrin and Vicodin. (Tr. 150).

On April 19, 2001, the Plaintiff underwent an MRI of her lumbar spine. (Tr. 148). The Plaintiff's soft tissues appeared normal, vertebral bodies were in good alignment, and the disc spaces were preserved. (Tr. 148). The MRI revealed degenerative changes on both sides of the L5-S1 joint and desiccated discs at L3-4, L4-5, and L5-S1. (Tr. 148). At L5-S1, there was no discrete disc bulging or herniation. (Tr. 148). At L4-5, there was no significant disc bulging, and mild facet hypertrophy without stenosis. (Tr. 148). At L3-4, there was no disc bulging or herniation and no stenosis. (Tr. 148). It was concluded that the Plaintiff had mild degenerative changes as described, no disc herniation or spinal stenosis. (Tr. 148).

On April 23, 2001, the Plaintiff presented to Dr. Islam for a follow-up. (Tr. 144). The Plaintiff complained of pain in the back area. (Tr. 144). The Plaintiff's physical examination was unchanged. (Tr. 22, 144). Dr. Islam noted that an MRI had been completed and that it shows degernative changes in the lower back area but was otherwise unremarkable. There was no herniation or any disc bulging. (Tr. 144). The Plaintiff was given Flexeril 10 mg, a Medrol dosepak, and was referred to physical therapy three (3) times a week for two (2) weeks. (Tr. 144). The Plaintiff was directed to do light duties and follow-up in a week. (Tr. 144). However, the Plaintiff insisted on seeing a neurologist. (Tr. 144). Dr. Islam explained to the Plaintiff that the results of the MRI were okay and further evaluation and MMI determination would be handled by a neurologist at her request and she would not longer be seen at his office. (Tr. 144).

On May 10, 2001, the Plaintiff presented to Dr. Edward F. Steinmetz, a neurologist. (Tr. 171). The Plaintiff reported injuring her back at work six years ago. (Tr. 171). The Plaintiff

4

reported being relieved of her duties in the last few weeks by her employer.  (Tr. 172).  The Plaintiff

also advised Dr. Steinhmertz that her pain was a 10 on a scale of 0-10.  (Tr. 171).  The Plaintiff also

advised she was told she had fibromyalgia. (Tr. 173).  Upon examination, the Plaintiff showed to be

hypertensive, and obese at 5 feet 4 inches tall and 215 pounds.  (Tr. 172-173).  The Plaintiff has

minimally positive mechanical signs on straight leg raising at 80 degrees.  (Tr. 173).  Neurological

examination showed some strong functional weakness, give-way weakness but otherwise

unremarkable.  (Tr. 173).   The Plaintiff's extremities were without edema or deformity.  (Tr. 22,

172).  She has good pulses in both feet.  (Tr. 22, 172).  The Plaintiff did complain of pain on forward

flexion of the lumbar spine.  (Tr. 22, 172).   There was no fasciculations or focal atrophy in the

Plaintiff's calves or thighs.  (Tr. 22, 172).   Dr. Steinhemetz ordered a bone scan and an MRI of the

dorsal spine to rule out any dorsal compression process or aseptic necrosis process.  (Tr. 22-23, 174).

Dr. Steinhemetz agreed with a GI evaluation for the Plaintiff's complaint of urinary and stool

incontinence.  (Tr. 174).  Dr. Steinhemetz gave the Plaintiff Vicodin for a couple of weeks and kept

her off work.  (Tr. 23, 174).  Dr. Steinhemetz specifically notes that is is "certainly hard to explain

the extent of her complaints and problems on the basis of essentially normal MRI and a mild lifting

incident.  (Tr. 174).

        The Plaintiff returned to Dr. Steinhemetz on June 7, 2001 for follow-up care.  (Tr. 169).  Dr.

Steinhemetz stated that the Plaintiff's MRI showed some mild degenerative disc changes, but no

neurocompression.  (Tr. 169).  The Plaintiff's bone scan was normal.  (Tr. 169).  Dr. Steinhemetz

stated that the Plaintiff was requesting what sounded like an epidural block and more therapy and that

she felt she could not perform light duty.  (Tr. 169).  Dr. Steinhemetz stated that the Plaintiff had

strong functional motor qualities.  (Tr. 169).   It was determined that the office had nothing further

5

to offer the Plaintiff and had reached maximum medical improvement. (Tr. 169). The Plaintiff maintained she could not work due to her numerous complaints. (Tr. 169). Dr. Steinhemetz determined that the Plaintiff should get assistance somewhere else for management and that video surveillance would probably reveal her true capabilities. (Tr. 169).

The Office of Disability Determination referred the Plaintiff to Dr. Patrick Ijewere for a consultative examination based upon the Plaintiff's complaints of low back, shoulder pain, asthma, carpal tunnel, right hand deformed, allergies, fibromyalgia, fatty tumor left back, csyt in left breast, sacroilitis . (Tr. 23, 208). The Plaintiff reported having asthma for ten (10) years with infrequent severe attacks; carpal tunnel in her left hand; right hand deformed because of a 1st metacarpal fracture twenty (20) years ago with sporadic pain; fatty tumor on her left back since 1997 with no significant change in size and cyst in her left breast, which biopsy was benign in June 2001. (Tr. 23, 208).

Physical examination showed that the Plaintiff was 5 feet 3 inches tall and weighed 220 pounds. (Tr. 23, 209). The Plaintiff was in no distress, and considered well groomed, well developed and morbidly obese. (Tr. 208). The Plaintiff's cognition and mood was intact with normal affect, not anxious and related well to staff. (Tr. 209). Dr. Ijewere noted mild right shoulder tenderness. (Tr. 208). Examination of her head, ears, eyes, nose and throat were unremarkable. (Tr. 23). The Plaintiff's chest was clear and her heart had a regular rate and rhythm. (Tr. 23, 209). There was no cyanosis, no edema, no clubbing and no stasis dermatitis of her extremities and no significant deformity of her right thumb. (Tr. 23, 209). Examination of the Plaintiff's spine revealed mild cervical, thoracic and lumbosacral tenderness and no paraspinal spasm. (Tr. 23, 209). There were no motor, sensory, or reflex deficits. (Tr. 23, 209). The Plaintiff's gait was normal without use or need for an assistive device. (Tr. 23, 209). Grip strength was 5/5 in both hands. (Tr. 23, 209).

6

Dr. Ijwere opined that the Plaintiff has mild fibromyalgia with no significant limiting findings, her asthma was stable, pain in the right hand was mild with no functionally significant deformity, sacroilitis in the left back with mild to moderate pain, and a benign cyst in the left breast. (Tr. 210). Dr. Ijwere further opined that the Plaintiff was able to tolerate a desk, or other low physical job. (Tr. 23, 210).

On February 26, 2002, the Plaintiff presented to Dr. Lawrence Black at the Gulf Coast Hospital emergency room. (Tr. 221-246).   The Plaintiff's chief complaint was uncomfortable abdominal pain in the lower right quadrant. (Tr. 222). Dr. Black noted that the Plaintiff went to the Lee Memorial Health Park Emergency Room and underwent an ultrasound that revealed a possible fecalith in the right lower quadrant, but left prior to being seen. (Tr. 222). The Plaintiff's white count was normal at seven (7) and no left shift. (Tr. 222). The Plaintiff had no fever and liver functions, amylase, and lipase were normal. (Tr. 222). The Plaintiff underwent a CT scan of the abdomen to "rule out appendicitis". (Tr. 222). There appeared to be some fluid behind the cecum but it was not a strong finding. (Tr. 222). Upon physical examination, the Plaintiff was very comfortable and appeared younger than her stated age. (Tr. 223). The Plaintiff had no difficulty getting on top of the examination table. (Tr. 223). The Plaintiff did not appear ill, her neck is supple and non-tender without lymphadenopathy or thyromegaly. (Tr. 223). The Plaintiff's pulse was regular, her abdomen is rounded, obese, and basically soft. (Tr. 223). The Plaintiff had minimal right lower quadrant tenderness, just a mild, diffuse tenderness, but no guarding or mass. Dr. Black's assessment was abdominal pain and possible gastroenteritis. (Tr. 223).   Dr. Black determined that expectant observation was the appropriate course of action to completely rule out appendicitis. (Tr. 224).

Beginning in April 2002, the Plaintiff reported chest discomfort for approximately six (6)

7

months duration on and off intermittent in nature and sometimes severe. (Tr. 24). The Plaintiff's pain might occur on the right or lift side and felt as thought there was an achiness and cramp and occasional sharp pain lasting up to ten minutes in duration and worsening with deep breath. (Tr. 24).

On April 2, 2002, and EKG was performed. (Tr. 24). Upon examination, the Plaintiff was found to have a heart murmur so therefore an echocardiogram was performed. (Tr. 24). The EKG revealed a normal left ventricular size with preserved systolic function, mildly enlarged left atrium, moderate aortic valve stenosis and mild mitrral valve insufficiency. (Tr. 24, 250).

On May 1, 2002, the Plaintiff presented to Dr. James Butler upon referral from Dr. David Driesbach for a cardiology consultation. (Tr. 270-271). Upon physical examination, the Plaintiffs blood pressure was 170/82 and weight was 234 pounds. (Tr. 271). Heart examination revealed the point of maximum impulse is in the fifth intercostal space near the mid-clavicular line. (Tr. 271). There is normal sounding S1 and S2 which is regular. (Tr. 24, 271). S4 was present as well as grade II-II systolic murmur which as late peaking. (Tr. 24, 2710. The lungs were clear to auscultation and percussion. (Tr. 271). After examination, Dr. Butler recommended a myoview exercise stress test, repeated echocardiogram in 9 to 12 months to rule out progression of aortic valve stenosis and SBE prophylaxis with dental, colon and respiratory studies by the American Heart Association guidelines. (Tr. 24, 271).

The Plaintiff returned to Dr. Butler on May 15, 2002, for follow up care. (Tr. 24, 283). Dr. Butler noted that the Plaintiff underwent an echocardiogram which revealed normal left ventricular size with preserved systolic function, aortic valve was trileaflet calcified with a 41 millimeter peak gradient and the aortic valve area was estimated at 1.2 cm squared consistent with moderate aortic valvular stenosis. The Plaintiff had moderate aortic valvular insufficiency and 1+ mild mitral valvular

insufficiency.  (Tr. 283).  Dr. Butler referenced the myoview stress test and noted that the Plaintiff exercised for only three minutes showing poor exercise capacity.  The Plaintiff was able to obtain 86% of her age predicted maximal heart rate.  (Tr. 283). There was no hypertensive response and no chest pain with exercise.  (Tr. 283).  There were nonspecific ST changes noted with exercise and nuclear scan revealed no evidence of prior infarction or significant reversible ischemia.  (Tr. 283). There was normal wall motion, ejection fraction was estimated at 60%.  (Tr. 283).  Regarding the aortic stenosis, Dr. Butler suggested a strict SBE prophylaxis and advised the Plaintiff to return in nine (9) to twelve (12) months for a repeat echocardiogram.  (Tr. 283).

On July 12, 2002, the Plaintiff presented to Dr. Neil R. Schultz, a board certified physical medicine and rehabilitation specialist, for low back pain, bilateral lower extremity pain and numbness and bladder incontinence. (Tr. 24, 329).  Upon physical examination, the Plaintiff appeared to have midly limited range of motion in all planes throughout the lumbar spine secondary to pain. (Tr. 329). Motor examination revealed some weakness in the right ankle dorsiflexor 4-4+/5.  (Tr. 24, 239). Sensory examination was decreased to pinprick sensation in the right lower extremity in a L4-dermatomal distribution.  (Tr. 24, 329).  Dr. Schultz was concerned over cauda equine syndrome, given the Plaintiff's symptoms of low back pain with radicular symptoms in the lower extremities noting bladder incontinence.  (Tr. 329).  Dr. Schultz referred the Plaintiff to the Lee Memorial Emergency Room for further work-up and stat neurosurgery evaluation.  (Tr. 24, 330).  Dr. Schultz stated that if the Plaintiff's low back situation turned out to be non-surgical, the Plaintiff should return for conservative treatment.  (Tr. 24, 330).  The plaintiff notified Dr. Schultz on July 15, 2002, that she did not go to the emergency room as instructed because she could not sit for a prolonged period of time and asked for a referral to a neurosurgeon through her HMO plan.  (Tr. 24, 328).

9

On July 17, 2002, the Plaintiff was seen by Dr. Jaime A. Alvarez, a neurological specialist, for the Plaintiff's complaint of back pain.   Dr. Alvarez noted the Plaintiff's history regarding the causes of her back pain and urinary incontinence.  (Tr. 24, 299-300).   Physical examination showed full active range of motion of the extremities.   No cyanosis, clubbing, or edema and a negative straight leg raise.  (Tr. 301).   Dr. Alvarez noted the Plaintiff was tender to palpation over her sacroiliac joints bilaterally.  (Tr. 301).   The Plaintiff was non-tender over her sciatic notches.  (Tr. 301).   Neurologic examination revealed strength 5/5 in the upper and lower extremities bilaterally with encouragement.  (Tr. 301).   Deep tendon reflexes are essentially absent in the upper extremities bilaterally and knee jerks are trace bilaterally.  (Tr. 301).   The Plaintiff could walk on her heels and toes; although she could not do a deep knee bend very well bilaterally.  (Tr. 301).   Dr. Alvarez noted the MRI report of April 19, 2001, indicates mild degenerative changes without disc herniation or stenosis. (Tr. 301).   Dr. Alvarez wanted to obtain a new MRI of her thoracic and lumbar spine to rule out a lesion.  (Tr. 301).   Dr. Alvarez referred the Plaintiff to a urologist for evaluation of the incontinence because he was not convinced it was emanating from her spine.  (Tr. 301).

On December 18, 2002, the Plaintiff returned to Dr. Butler.  (Tr. 25, 282).   The Plaintiff's blood pressure is 128/80.  (Tr. 282).   The Plaintiff's heart examination revealed normal sounding S1 and S2.  There was a Grade 2/6 mid-to-late peaking systolic murmur and soft diastolic component.  (Tr. 282).   The lungs were clear to auscultation and the extremities reveal no edema.  (Tr. 282).   Dr. Butler suggested that a repeat echocardiogram should be performed six to eight months prior to her next visit and continue with SBE prophylaxis.  (Tr. 282).

On December 9, 2002, the Plaintiff was seen at the Medical Group of Southwest Florida for lower back pain.  (Tr. 25, 289-295).   Examination revealed muscle spasms to palpation in the

10

paraspinal area bilaterally.  (Tr. 24).  The doctor's assessment was chronic lumbar pain.  (Tr. 24).

The Plaintiff was given Robaxin and Ibuprofen.  (Tr. 24).

The Plaintiff returned to Dr. Schultz on December 30, 2002, for follow up care.  (Tr. 25,

326).  Upon examination, neurologically, the Plaintiff had mild weakness of the right ankle dorsiflexor

4+.  The Plaintiff showed decreased pinprick sensation in the right lower extremity in a L4

dermatomal distribution.  (Tr. 326).  Dr. Schultz opined that the Plaintiff has lumbar radiculopathy

with a history of lumbar degenerative disc disease.  (Tr. 326).  Dr. Schultz discussed her symptoms,

physical exam findings and previous treatment, and recommended that they start physical therapy for

4 weeks, follow up in one month to check progress, and continue on Robaxin and Ibuprofen.  (Tr.

326).  Dr. Schultz opined that the Plaintiff appeared to be incapable of working at this time due to

her persistent low back pain.  (Tr. 327).

On November 26, 2003, the Plaintiff reported the same symptoms to Dr. Butler.  (Tr. 281).

Upon examination, the Plaintiff's blood pressure was 124/70 and she weighed 234 pounds. (Tr. 287).

Heart examination again revealed normal sounding S1 and S2 and a Grade 2/6 mild to late peaking

systolic murmur and a soft diastolic component.  (Tr. 26, 287).  The Plaintiff's lungs were clear and

her extremities had no edema.  (Tr. 26, 287).  Dr. Schultz ordered a repeat echocardiogram and an

adenosine Cardiolote exercise test.  (Tr. 287).

On December 1, 2003, an MRI scan was performed on the Plaintiff's lumbar spine. (Tr. 26,

343).  The MRI revealed transitional appearances of the thoracolumbar and lumbosacral junctions,

with a transitional thoracolumbar element referred to as L1 with hypoplastic ribs and with the

transitional lumbosacral element referred to at S1 which is imcompletely sacralized; mile lumbar

spondylosis with chronic degenerative disc disease; no neurocompressive lesion was identified at any

level.  (Tr. 343).

On December 9, 2003, the Plaintiff was seen for a neurological evaluation by Dr. Donald J. Moyer upon request of Dr. Hilario David.  (Tr. 296).  The Plaintiff complained that her back pain was worse than the leg pain ranging from excruciating pain (10/10) to pressure and usually worse in the mornings.  (Tr. 296). The Plaintiff also complained of some numbness and weakness of her legs with second and third toe on the right foot with numbness.  (Tr. 296).  The Plaintiff stated that ice and ibuprofen was a relieving factor.  (Tr. 296).  Musculoskeletal examination revealed no muscle atrophy, no tenderness along the spinous processes, full range of motion of all extremities, tenderness to palpation along the iliopsoas muscles bilaterally.   Neurologically, the Plaintiff's cranial nerves II through XII were grossly intact.  (Tr. 297).  Sensation to light touch intact distally upper extremities and lower extremities with the exception of dorsum right foot reveal hypoesthesia. (Tr. 297).  Muscle strength testing was 5/5 in the upper and lower extremities bilaterally.  (Tr. 297).  Cerebral testing was intact and gait was normal. (Tr. 297).  The Plaintiff had difficulty heel/toe walking.  (Tr. 297). The Plaintiff tested negative for Hoffman's and straight leg raise bilaterally.  (Tr. 297).  No pain was elicited on hip rotation.  (Tr. 297).  Based upon Dr. Moyer's examination and review of previous radiographic findings, Dr. Moyer opined that the Plaintiff had lumbar radiculopathy.  (Tr. 298).  Dr. Moyer discussed treatment options including epidural steroid injections and surgery if conservative treatment methods fail. The Plaintiff was referred to pain management for up to three injections.  (Tr. 298).

On March 19, 2004, Dr. Hilario David completed pain interrogatories.  (Tr. 295).  He stated that the Plaintiff had been under his care since September 12, 2003.  Dr. David stated the Plaintiff was diagnosed with asthmatic bronchitis, low back pain, and aortic valve stenosis.  (Tr. 26, 295).  Dr.

12

Hilario stated that a lumbar MRI on December 8, 2003, showed mild lumbar spondylosis and chronic degenerative changes.  (Tr. 26, 295).

The Plaintiff returned to Dr. Moyer on March 30, 2004, for follow-up care.  The Plaintiff reported that she did not undergo the epidural steroid injections because of her fear of infection from it. (Tr. 27, 361).  The Plaintiff wished to discuss her surgical options.  (Tr. 361).  The Plaintiff's MRI results were not available and her physical examination remained unchanged.  (Tr. 27, 361).  However, he did note that the Plaintiff's last MRI showed degenerative disc disease at L5-S1 with Modic endplate changes and disc bulge he would recommend L5-S1 posterior lumbar interbody fusion. (Tr. 27, 361).  The Plaintiff was cleared from a cardiac standpoint. (Tr. 27, 361). Dr. Moyer completed a physical capacity evaluation.  (Tr. 26, 305-309).  Dr. Moyer opined that the Plaintiff could sit, stand or walk one hour in an eight hour workday, occasionally lift up to 10 pounds, occasionally bend and squat but was never to crawl or climb.  (Tr. 305-309).  He stated the claimant could reach above shoulder level and use her hands and feet for repetitive movements. (Tr. 27, 305-309).

<u>*Administrative Law Judge's Decision*</u>

Upon consideration of the record, the ALJ found that the Plaintiff meets the nondisability requirements for a Period of Disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for these benefits at least through the date of the decision. (Tr. 30).  The ALJ found the Plaintiff did engage in substantial gainful activity through May 6, 2001 and was not disabled during this period under 20 CFR §404.1520(b).  (Tr. 30).  The ALJ further found that the Plaintiff as of May 6, 2001, had an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR §404.1520(c).  (Tr. 30).

However, the ALJ found that the medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (Tr. 30). The ALJ determined that the Plaintiff's allegations regarding her limitation and inability to work are not credible. (Tr. 30). The ALJ, upon careful consideration of all of the medical opinions, found the Plaintiff's symptoms, includig pain, as established by the evidence of record and as evaluated under Social Security Ruling 96-7p, 20 CFR §404.1529 and the Eleventh Circuit pain standard set forth in Landry v. Heckler, 782 F.2d 1551 (11th Cir. 1986) are not of sufficient severity, intensity or duration to be "disabling" in and of themselves or to reduce her residual functional capacity further. (Tr. 30). The ALJ determined that the Plaintiff retained the residual functional capacity to perform up to light work. (Tr. 30). Further, the ALJ stated that the Plaintiff's impairments have not prevented her from performing her past relevant work as a sales representative, a manufacturer representative and a sales person. (Tr. 30). Therefore, the ALJ concluded that the Plaintiff has not been under a "disability" as defined in the Social Security Act, at any time on or before the date of this decision. 20 CFR §404.1520(f).

## THE STANDARD OF REVIEW

### A. Affirmance

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, Richardson v. Perales, 402 U.S. 389, 390, 91 S. Ct. 1420, 28 L. Ed 2d 842 (1971). In evaluating whether a claimant is disabled, the ALJ must follow the

sequential inquiry described in the regulations[2].  See 20 C.F.R. §§ 404.1520(a), 404.920(a).  The

Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. §

405(g).  Substantial evidence is more than a scintilla-*i.e.*, the evidence must do more than merely

create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable

person would accept as adequate to support the conclusion.  Foote v. Chater, 67 F.3d 1553, 1560

(11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982)); Richardson, 402

U.S. at 401.

Where the Commissioner's decision is supported by substantial evidence, the District Court

will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the

reviewer finds that the evidence preponderates against the Commissioner's decision.  Edwards v.

Sullivan, 937 F.2d 580, 585 n.3 (11th Cir. 1991); Barnes v. Sullivan, 932 F.3d 1356, 1458 (11th Cir.

1991).  The District Court must view the evidence as a whole, taking into account evidence favorable

as well as unfavorable to the decision.  Foote, 67 F.3d at 1560; Lowery v. Sullivan, 979 F.2d 835,

---

[2]The inquiry requires the ALJ to engage in a five-step analysis, which will either preclude or mandate a finding of disability.  The steps are as follows:
   *Step 1.*  Is the claimant engaged in substantial gainful activity?  If the claimant is engaged in such activity, then he or she is not disabled.  If not, then the ALJ must move on to the next question.
   *Step 2.*  Does the claimant suffer from a severe impairment?  If not, then the claimant is not disabled.  If there is a severe impairment, the ALJ moves on to step three.
   *Step 3.*  Does the claimant's impairment meet or equal one of the listed impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If so, then the claimant is disabled.  If not, the next question must be resolved.
   *Step 4.*  Can the claimant perform his or her former work?  If the claimant can perform his or her past relevant work, he or she is not disabled.  If not, the ALJ must answer the last question.
   *Step 5.*  Can he or she engage in other work of the sort found in the national economy?  If so, then the claimant is not disabled.  If the claimant cannot engage in other work, then he or she is disabled.  See 20 C.F.R. §§404.1520(a)-(f), 416.920(a)-(f); see also Phillips v. Barnhart, 357 F.3d 1232, 1237-40 (11th Cir. 2004); Foote v. Chater, 67 F.3d 1553, 1557 (11th Cir. 1995) (per curiam).

837 (11th Cir 1992) (holding the court must scrutinize the entire record to determine reasonableness of factual findings).

The court "may not decide the facts anew, reweigh the evidence or substitute it's judgment for that of the [Commissioner]."Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983).  If the Commissioner's decision is supported by substantial evidence, it should not be disturbed. Lewis v. Callahan, 125 F. 3d 1436, 1440 (11th Cir. 1997).

**B.  Reversal and Remand**

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405 (g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. Keeton v. Department of Health and Human Services, 21 F.3d 1064, 1066 (11th Cir. 1994); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner, and order an award of disability benefits, where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).

The district court may also remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405 (g); under sentence six of 42 U.S.C. § 405 (g); or under both sentences. Jackson v. Chater, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).

To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the

law relevant to the disability claim. Jackson, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); Davis, 985 F.2d at 534 (remand to the Secretary is warranted where the ALJ has failed to apply the correct legal standards).  Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. Falcon v. Heckler, 732 F.2d 827, 830 (11th Cir. 1984). (remand was appropriate to allow ALJ to explain the his basis of his decision).

On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence upon a showing that there is new evidence which is material and that there was good cause for the failure to incorporate such evidence into the record during a prior proceeding. Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983)(finding ALJ error and remanding to consider psychiatric evaluation); Reeves v. Heckler, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (remanding on the grounds that it is reversible error for the ALJ not to order a consultative examination when warranted). After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. Jackson, 99 F.3d at1095.

In contrast, a sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. Jackson, 99 F.3d at 1095. Sentence six of § 405 (g) provides:

> The court . . . may at any time order additional evidence to  be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405 (g) (sentence six). To remand under sentence six, the claimant must establish: 1.)

that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative

so that there is a reasonable possibility that it would change the administrative result; and 3.) there

is good cause for failure to submit the evidence at the administrative level.  Jackson, 99 F.3d at 1090 -

92; Keeton v. Dept. of Health and Human Serv., 21 F.3d 1064, 1068 (11th Cir. 1994).   With a

sentence-six remand, the parties must return to the district court after remand to file modified findings

of fact. Jackson, 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does not

enter a final judgment until after the completion of remand proceedings.[3] Id.

## THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than twelve

months. 42 U.S.C. §§ 416 (I), 423 (d)(1); 20 C.F.R. § 404.1505. The impairment must be severe,

making the claimant unable to do his or her previous work, or any other substantial gainful activity

which exists in the national economy. 42 U.S.C. § 423 (d)(2); 20 C.F.R. §§404.1505 - 404.1511.

## DISCUSSION

The Plaintiff asserts that (1) the ALJ committed reversible error in failing to provide good

cause for his rejection of the opinions of Dr. Moyer, her treating physician; (2) the ALJ's residual

functional capacity assessment is not based upon substantial evidence; and (3) the ALJ committed

---

[3]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. Jackson, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. Id. In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. Id.

reversible error in failing to consider the effects of her subjective complaints of pain on her ability to work.

### 1.  Whether the ALJ Failed to Provide Good Cause for Rejecting the Opinion of the Treating Physician

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. 20 C.F.R. § 404.1527 (d); Lewis, 125 F.3d at 1439 - 1441; Sabo v. Commissioner of Social Security, 955 F.Supp. 1456, 1462 (M.D. Fla. 1996).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527 (d)(2).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence, supports a contrary finding, or is wholly conclusory. Edwards v. Sullivan, 937 F.2d 580,  (11th Cir. 1991) (ALJ properly discounted treating Physician's report where the physician was unsure of the accuracy of his findings and statements); Morrison v. Barnhart, 278 F. Supp. 1331, 1334 (M.D. Fla. 2003).  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. Schnor v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987); Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).  When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the

medical issues at issue; (6) other factors which tend to support or contradict the opinion. 20 C.F.R.

§ 404.1527 (d).  However, a treating physician's opinion is generally entitled to more weight than a

consulting physician's opinion. 20 C.F.R. § 404.1527 (d)(2); Wilson v. Heckler, 734 F.2d 513, 518

(11th Cir.1984). Furthermore, should the ALJ discount the treating physician's opinion he must

clearly articulate the reasons for giving less weight to the opinion, and failure to do so is reversible

error. Morrison, 278 F. Supp. at1334.

The ALJ is required to review all of the medical findings and other evidence that supports a

medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making

the ultimate determination about whether a claimant meets the statutory definition of disability. 20

C.F.R. § 404.1527 (e). The ALJ is not required to give any special significance to the status of a

physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed

impairment, a claimant's residual functional capacity (20 C.F.R. §§ 404.1545 and 404.1546), or the

application of vocational factors because that ultimate determination is the providence of the

Commissioner. 20 C.F.R. § 404.1527 (e).

The Plaintiff argues the ALJ failed to give great weight to Dr. Donald Moyer, M.D., the

Plaintiff's treating neurologist. The Defendant responds that Dr. Moyer's opinion was not supported

by the evidence in the record.

In his decision the ALJ reviewed Dr. Moyer's treatment record with the Plaintiff.  The ALJ

noted that on December 19, 2003, the Plaintiff was referred to Dr. Moyer for a neurological

evaluation.  The ALJ stated:

> Dr. Moyer stated that a magnetic resonance imaging scan of the claimant' lumbar
> spine taken in December 2003 revealed degenerative disc disease and modic end-late
> changes L5-S1 with a disc bulge at L5-S1.  Treatment options included conservative

management with physical therapy and medications as well as epidural steroid injections and eventually surgery if conservative therapy fails.

(Tr. 26).  The ALJ noted that Dr. Moyer saw the patient again on March 30, 2004. (Tr. 27).  At that time, the Plaintiff told Dr. Moyer that she did not follow his complete treatment program because she was afraid of the epidural steroid injection. (Tr. 27).  She stated she was frustrated and tired of living in pain and would like to discuss surgical options.  (Tr. 27).  Dr. Moyer informed her that he had not yet received back the results of her MRI but he referred her to Dr. Butler for cardiac clearance and after receiving clearance  she could return to schedule surgery. (Tr. 27).   On March 30, 2004, Dr. Moyer completed a physical capacity evaluation in which he concluded the Plaintiff could sit, stand, walk, and occasionally lift ten pounds, occasionally bend and squat but was never to crawl or climb. (Tr. 27).  Dr. Moyer also opined that the Plaintiff could reach above her shoulder and use her hands and feet for repetitive work. (Tr. 27).

The ALJ concluded Dr. Moyer's RFC opinion was so disproportionate to the evidence in the record that it was not objective and so he gave Dr. Moyer's report no weight. (Tr. 28).  While it is true that an ALJ must give substantial weight to a treating physician, a treating physicians opinion may be rejected for good cause shown. Lewis, 125 F.3d at 1440.  Good cause exists when the treating physician's opinion was not bolstered by the evidence; when the evidence supports a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the physician's own medical records. Lindsey v Barnhart, 161 Fed. Appx. 862, 869 n. 9 (11th Cir. 2006).  The ALJ concluded that Dr. Moyer never scheduled any surgery but offered surgery as an alternative if the suggested conservative treatment failed. (Tr. 28).  Further the ALJ found that the Plaintiff failed to follow Dr. Moyer's treatment program and that the record was devoid of any evidence that the

Plaintiff completed the pain management treatment epidural steroid injections referred by Dr. Moyer to alleviate her symptoms. (Tr. 28).

Dr. Moyer only saw the Plaintiff two times and issued his RFC with the knowledge that the Plaintiff was not following the conservative treatment program he designed for her. Thus, ALJ demonstrated that Dr. Moyer's opinion and RFC were not based upon substantial evidence found in his own medical records and that Dr. Moyer's treating history with the Plaintiff was very limited. *See* Crawford v. Commissioner, 363 F.3d 1155, 1159 (11th Cir. 2004) (holding that an ALJ may discount a physician's opinion when it is not accompanied by objective medical evidence in the record). Therefore, the ALJ established the requisite good cause sufficient to reject Dr. Moyer's opinion and RFC.

*2. Whether the ALJ's Residual Functional Capacity Assessment is Based On Substantial Evidence*

The fourth step in the evaluation process requires the ALJ to determine the plaintiff's residual functional capacity (RFC) and based on that determination, decide whether the plaintiff is able to return to his/her previous work. McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986). The determination of RFC is within the authority of the ALJ and along with the claimant's age, education, and work experience the RFC is considered in determining whether the claimant can work. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing 20 C.F.R. § 404.1520(f)). The RFC assessment is based upon all the relevant evidence of a claimant's remaining ability to do work despite her impairments. Phillips v. Barnhart, 357 F.3d 1232, 1238 (11th Cir. 2004); Lewis, 125 F.3d at 1440 (11th Cir. 1997) (citing 20 C.F.R. § 404.1545(a)). The ALJ must determine the claimant's RFC using all relevant medical and other evidence in the case. Phillips, 357 F.3d at 1238. That is, the ALJ must determine if the claimant is limited to a particular work level. Id. (citing 20 C.F.R. § 404.1567).

22

_____The ALJ found the Plaintiff had the RFC to perform a full range of light work and therefore reached the decision the Plaintiff could return to her past relevant work.  The Plaintiff argues the ALJ failed to support his assessment of the Plaintiff's RFC with substantial evidence because he improperly rejected the opinion of Dr. Moyer, Dr. Schultz, and Dr. Ijewere.  The Defendant responds the ALJ did not reject the opinions of Dr. Schultz or Dr. Ijewere but acknowledged them.  The Defendant asserts the ALJ's decision was based upon the overall medical record which established that the Plaintiff's complaints of back pain were not substantiated with medical evidence.  As noted above, the Court has already found the ALJ properly discounted the opinion of Dr. Moyer and therefore will not address his opinion again.

The ALJ held:

[t]he evidence does not reveal that the claimant had required unusually frequent or extraordinary treatments.  Her complaints of constant severe back pain have not been substantiated by findings on physical examination or testing such as radiographic studies.  Findings on physical examination generally reflect good range of motion and no positive signs of significant abnormalities that would give rise to the degree of pain alleged.  In fact, examinations revealed the claimant to be tender to palpation over her sacroiliac joints bilaterally.  Straight leg rising was negative bilaterally.  She had a normal gate.  The claimant testified at the hearing that Dr. Moyer suggested surgery.  While this is true, evidence reveals Dr. Moyer stated eventually surgery if conservative treatments fail.  The evidence is devoid of the claimant undergoing referral to a pain management for a series of epidural steroid injections in order to alleviate her symptoms. . . .

While the claimant does have moderate aortic valvular stenosis with moderate aortic valvular insufficiency this condition is under control with SBE prohylaxis.  Although the claimant alleged she had asthma there are no medical records to corroborate an asthmatic condition.  She also testified she was diagnosis with fibromyalgia but medical records do not substantiate this.  Furthermore, she alleged carpal tunnel syndrome in her left hand and right hand deformity but on testing grip strength in both hands was normal at 5/5 and showed no signs of deformity in the right hand.

(Tr. 28).  The Plaintiff argues that the ALJ made a factual error here because he stated the

23

record was devoid of any referral to a pain management specialist. However, it is clear from the context that the ALJ was referring to the fact that the Plaintiff did not proceed with her epidural injections as suggested by Dr. Moyer.

In his decision the ALJ reviewed the opinion of Dr. Ijewere. (Tr. 23). Dr. Ijewere opined:

> Examination of her spine revealed <u>mild</u> cervical, thoracic and lumboscaral tenderness and no paraspinal spasm. There were no motor, sensory or reflex deficits. Her gate was normal without use or need for assistive device. Grip strength was 5/5 in both hands. The impression was mild fibromyalgia with no significant limiting findings; asthma, stable; left carpal tunnel syndrome not objectively evident; right hand pain mild with no functionally significant deformity; let back sacroiliitis mild to moderate pain and left breast cyst benign. This physician sated the claimant had no difficulty getting in and out of an armless chair and the examining table. He felt the claimant should be able to tolerate a desk, low physical job.

(Tr. 23).

The ALJ presented a thorough review of Dr. Schultz's records and a complete discussion of his opinion (Tr. 24-26). The Plaintiff first saw Dr. Schultz on July 12, 2002. (Tr. 24). Upon examination Dr. Schultz found the Plaintiff had mildly limited range of motion in all planes throughout the lumbar spine secondary to pain. (Tr. 24). He referred the Plaintiff to Lee Memorial Emergency Room for further work-up and neurosurgery evaluation. (Tr. 24). On December 30, 2002, Dr. Schultz saw the Plaintiff for follow-up care. (Tr. 25). The ALJ recorded that December 30, 2002, was the first time since July 12, 2002, that the Plaintiff had seen Dr. Schultz. (Tr. 25). Dr. Schultz reported that Dr. Alverez did not think the Plaintiff was a good candidate for surgery. (Tr. 25). During the December visit the Plaintiff reported that her bladder incontinence had resolved. ( Tr. 25). Dr. Schultz also noted that the Musculoskeletal examination revealed moderately decreased range of motion of the lumbar spine in all directions secondary to pain. Motor strength testing revealed mild weakness of the right ankle dorsiflexir 4+. Sensory examination decreased pinprick sensation

right lower extremity in a L4 dermatoral distribution. (Tr. 25-26). The impression was subjective lumbar radiculopathy. (Tr. 26). A four week course of physical therapy as well as continued use of Robaxin and Ibuprofen was recommended. (Tr. 26). Dr. Schultz stated the claimant did not appear to be capable of working at this time due to her reported persistent low back and lower extremity pain. (Tr. 26). The ALJ further reviewed the opinions of Dr. Butler, Dr. Moyer, Dr. Hilario David. In addition, the ALJ also considered the opinions of the BDD expert physicians. (Tr. 28). The original BDD expert opined the Plaintiff was capable of performing an RFC of medium level work. (Tr. 28). The second BDD expert opined the Plaintiff was able to perform an RFC of light level work.

While the Plaintiff argues that the ALJ failed to give great weight to the opinions of Dr. Ijewere and Dr. Schultz, the record shows that Dr. Ijewere only saw the Plaintiff one time. Opinion of physicians who are one time examiners are not entitled to great deference. McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987). Regarding Dr. Schultz, he only saw the Plaintiff twice and did not report any results of any MRI's or any other medical tests used to make his determination that the Plaintiff could not work. Furthermore, Dr. Schultz is the only physician that opined the Plaintiff could not work.

In making his determination regarding a treating physician, the ALJ must weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical issues at issue; (6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527 (d). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported

by objective medical evidence, supports a contrary finding, or is wholly conclusory. <u>Edwards v. Sullivan</u>, 937 F.2d 580, (11th Cir. 1991);<u>Morrison v. Barnhart</u>, 278 F. Supp. 1331, 1334 (M.D. Fla. 2003). In this case, the ALJ did a thorough review of the medical record and properly considered the opinions of all the physicians in making his RFC determination. Thus, the Court finds that the ALJ supported his RFC assessment with substantial evidence in the record, including a review of the evidence and opinions that favored the Plaintiff's position, and properly determined the Plaintiff's RFC.

### (3) Whether the ALJ Committed Reversible Error in Failing to Consider the Effects of the Plaintiffs Subjective Complaints of Pain on her Ability to Work

The Plaintiff argues that the ALJ committed reversible error in failing to consider the effects of her subjective complaints of pain on her ability to work. The Commissioner submits that the ALJ's evaluation of Plaintiff's impairments properly complied with the regulations regarding the evaluation of pain and other symptoms, which provide that subjective statements of disabling pain are not alone sufficient to establish disability. 20 C.F.R. § 404.1529 (2006). The Commissioner asserts that the regulation requires medical signs or findings which show a medical condition that could reasonably be expected to produce the alleged symptoms, such as pain. 20 C.F.R. § 404.1529(a), (b). Once such a condition has been shown, the intensity and persistence of the symptoms may be evaluated based on all the available evidence. C.F.R. § 404.1529 (c)(1). A variety of factors will be considered in evaluating the intensity and persistence of symptoms which would limit an individual's capacity for work. 20 C.F.R. § 404.1529 (c).

Pain is a non-exertional impairment. <u>Id.</u> at 1559. Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g. medical signs and

laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423 (d)(5)(A). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1528. In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard." Foote, 67 F.3d at 1560.

The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain. Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991). Pain alone can be disabling, even when its existence is unsupported by objective evidence, Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability. 42 U.S.C. § 423 (d)(5)(A).

The ALJ determined that "the claimant's statements concerning her impairments and their impact on her ability to work not entirely credible in light of discrepancies between the claimant's assertions and information contained in the documentary reports..." (Tr. 28). In support of this finding, the ALJ articulated that:

> [t]he evidence does not reveal that the claimant had required unusually frequent or extraordinary treatments. Her complaints of constant severe back pain have not been substantiated by findings on physical examination or testing such as radiographic studies. Findings on physical examination generally reflected good range of motion and no positive signs of significant abnormalities that would give rise to the degree of pain alleged. In fact, examinations revealed the claimant to be tender to palpation over her sacroiliac joints bilaterally. Straight leg rising was negative bilaterally. She

27

had a normal gait.  The claimant testified at the hearing that Dr. Moyer suggested surgery.  While this is true, evidence reveals Dr. Moyer stated eventually surgery if conservative treatments fail.  The evidence is devoid of the claimant undergoing referral to a pain management for a series of epidural steroid injections in order to alleviate her symptoms.

(Tr. 28).   The ALJ also noted that Dr. Moyer did not give her any prescriptions for pain medications and further the Plaintiff failed to seek pain relief treatment as recommended by Dr. Schultz. (Tr. 26, 27).  While the Plaintiff asserts the ALJs conclusion that she did not seek referral to pain management is untrue, the pain management clinic referred to by the Plaintiff was Dr. Schultz. (Tr. 326-330).  As noted above, the ALJ adequately discredited Dr. Schultz's opinion in the body of his decision.  Thus, the ALJ clearly articulated that the Plaintiff failed to support her pain allegations with underlying medical evidence as required by Holt v. Sullivan.  Therefore, it is respectfully recommended the decision of the Commissioner be affirmed.

Accordingly it is hereby **RESPECTFULLY RECOMMENDED:**

The Decision of the Commissioner should be **AFFIRMED.**

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**DONE AND ORDERED** at Fort Myers, Florida, this 16th day of January 2007.

Sheri Polster Chappell

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies:  Counsel of Record

28